**UNION CARBIDE CORPORATION,**
Plaintiff,

v.

**BORG–WARNER CORPORATION** and
**Sund-Borg Machines Corporation,**
Defendants.

No. C 72–426.

United States District Court,
N. D. Ohio, W. D.

Aug. 22, 1975.

Vincent L. Barker, Jr., Owen & Owen, Toledo, Ohio, John D. Foley, Morgan, Finnegan, Durham & Pine, New York City, for plaintiff.

Thomas L. Dalrymple, Fuller, Henry, Hodge & Snyder, Toledo, Ohio, for defendants; Dugald S. McDougall, Theodore R. Scott, James P. Ryther, Chicago, Ill., of counsel.

## FINDINGS OF FACT, CONCLUSIONS OF LAW and JUDGMENT ORDER

WALINSKI, District Judge:

In this patent infringement suit, the principal issue is whether a claim is invalid for lack of novelty or obviousness, or whether the entire patent is invalid for failure to disclose the best mode. As will become apparent, the Court has resolved these is-

sues in favor of defendants and will enter judgment accordingly.

## I. Findings of Fact

1) This is an action for infringement of U. S. Patent No. 3,268,636 [hereafter the 636 patent]. There is no issue of title involved.

2) The Court has jurisdiction of the parties and the subject matter, and venue is proper in this Court.

   a. Plaintiff is a New York corporation having its principal place of business in New York City.

   b. Defendant Borg-Warner Corporation [hereafter BWC] is a Delaware corporation and has its principal place of business in Chicago, Illinois. BWC also has a place of business at Fremont, Ohio, which is within this district.

   c. Defendant Sund-Borg Machines Corporation [hereafter SBMC] also is a Delaware corporation and has its principal place of business at Rockford, Illinois. SBMC is wholly owned by BWC and Sundstrand Corporation.

3) The issues raised by the pleadings and tried to the Court are:

   a. Whether Claim 1 of the 636 patent has been infringed by defendants.

   b. Whether Claim 1 of the 636 patent is invalid because:

      1. It lacks novelty having been anticipated by the prior art, or

      2. It is obvious in light of the prior art.

   c. Whether the 636 patent is wholly invalid because of plaintiff's failure to disclose the best mode contemplated to carry out the process which is the subject of the invention.

4) In the interests of the efficient administration of justice the Court will decide all of these issues even though one issue may theoretically have been rendered moot by a decision of another.

5) The 636 patent, entitled "Method And Apparatus For Injection Molding Foamed Plastic Articles," was issued August 23, 1966. The subject of the patent was conceived by Richard G. Angell, Jr., an employee of plaintiff to whom he assigned all rights thereunder. Subsequent to issuance, however, plaintiff disclaimed all apparatus claims of the 636 patent, i.e., Claims 9 through 13, stating that they were "too broad or invalid" in view of the prior art cited in the file history of the patent. Of the remaining claims in the 636 patent, Claim 1 alone is alleged to have been infringed.

6) Injection molding, as the term is generally used by those skilled in the art pertinent to this case, refers to a forcible introduction of hot, molten plastic into a mold where the contents are allowed to cool and harden. The use of injection molding to make solid plastic articles was already well established and enjoyed commercial success by the beginning of the 1960's.

7) In the "closed molding" process, a simple injection molding machine consisted of a chamber for heating the plastic, a molding chamber or mold, and some means for rapidly transferring the hot molten plastic under pressure from the heating chamber into the mold.

8) This process came to include the concept of "metering" the amount of hot plastic to be molded. An "accumulation chamber" was placed between the heating chamber and the mold, and the machines used had some means for transferring a measured amount of molten material from the heating chamber to the accumulation chamber and then to the mold.

9) Two types of means to move molten plastic from the heating chamber to the accumulation chamber were known to those in the prior art:

   a. The heating chamber contained a "reciprocable ram" which could move forward to extrude molten plastic from the heating chamber or extruder; and

   b. The heating chamber contained a "rotary screw" which when activated "screwed" or extruded the molten plastic out of the heating chamber.

The former type is called a "ram type extruder," while the latter is called a "screw extruder." The ram type was intermittent in operation while the screw type was more or less continuous.

10) A machine with an accumulation chamber was known as a "two-stage" injection molding machine. Such machines were part of the prior art when plaintiff's inventor began his activities which culminated in the issuance of the 636 patent. These machines were then used, however, to mold solid plastic articles.

11) During the 1950's, those in the plastics industry began to use their injection molding machines to make "foamed plastic" products, i.e., plastic articles characterized by a lower density than solid plastic articles. This lower density is achieved by mixing the plastic material, which itself is usually in the form of powder, beads, or granules, with a chemical "blowing agent." When heated to an appropriate temperature, which varies with the type of chemical used, the blowing agent changes to a gaseous state which ultimately results in interior pores or cells in the formed, foamed plastic article caused by bubbles of gas which have been permitted to expand. The amount of plastic used is insufficient by itself wholly to occupy the cavity of the mold being used; it is the expansion of the blowing agent mixed with the plastic which results in filling of the mold. The finished product is thus of less density than a solid plastic article would be if made to the same dimensions but without the blowing agent and with a comparably increased amount of plastic used.

12) The action of the expansion of the blowing agent pushing the plastic material against the walls of the mold causes a kind of "skin" to form on the finished article. In the early foamed plastic products of the prior art, this skin was usually quite thin and the resulting products certainly could not be characterized as "structural" as plaintiff uses that term, i.e., having a strength-to-weight ratio sufficient to meet a specific need. The prior art products such as coffee cups and ice buckets required little "structural" capabilities.

13) The prior art came to include injection molding processes for making foamed plastic articles. By 1961, Dow Chemical Company had devised a process for injection molding of products with a woodgrain effect. This process, called Frostwood, involved using a plastic-and-foaming agent composition of Dow's called Pelaspan F in a standard injection molding machine. The products realized by this process had a foamed cellular core overlain by a surface skin which was smooth. Dow instructed Frostwood's practitioners that the molten plastic should remain unexpanded by the blowing agent, a pentane gas, until the composition reached the mold; that the pressure within the mold should be kept near atmospheric pressure, which is below the pressure exerted by the expanding blowing agent; and that the mold temperature should be quite cool. Thus, a practitioner skilled in the art knew from this process that low mold temperature and pressure accompanied by exertions from a rapidly expanding plastic-cum-blowing agent composition produced a foamed plastic product whose cellular core gradually changed to an "integral skin" which inferentially affected the strength-to-weight ratio of the product, depending on the relative amount of plastic used to a given mold size. At least a British writer in early 1962 so inferred. (Def. Ex. A, Tab 11.)

14) At the same time, the Foster-Grant Company developed a process for injection molding of foamed plastic products. This process utilized a two-stage injection molding machine, i.e., one containing an accumulation chamber between the extruder, where the heating usually had taken place in prior art machines, and the mold. The Foster-Grant process added another new wrinkle by accomplishing its final heating to a molten state in the accumulation chamber for certain plastic and blowing agent compositions, i.e., the heating in the extruder was sufficient for some types of mixtures but not for others. Where appropriate, the necessary molten temperatures

were achieved in the accumulation chamber.[1]

15) Foster-Grant's process is disclosed in the Eyles patent (U. S. 3,162,703) which essentially teaches the evils of premature expansion of the blowing agent by urging maintenance of the mixture under pressure until molding; the use of a low pressure and low temperature mold; and, among other kinds, the use of pentane as a blowing agent which converts to a gas at about 96° F.

16) The Eyles patent also taught melting and mixing of pentane coated polystyrene beads in an extruder. This is so because this mixture achieves a molten state at a temperature near 200° F, and Eyles specifically taught heating such a mixture in his extruder to a temperature from 180° F to 220° F while holding the mixture under sufficient pressure to prevent foaming or expansion of the blowing agent. Thus, implicitly if not expressly, Eyles taught those skilled in the art to heat the mixture in the extruder to a temperature above the foaming temperature and also above the melting temperature.

17) Eyles also taught extruding the mixture to an accumulation zone which expands as the mixture is fed in but maintains sufficient pressure to prevent expansion of the blowing agent. Additionally, the mixture is further heated to nearly 300° F in the accumulation zone or chamber.

18) Eyles also teaches transferring rapidly this mixture from the accumulation zone into the mold by "establishing communication" between the expandable accumulation zone and a mold maintained at a lower temperature by venting.

19) Plaintiff's inventor Angell began his work which culminated in the 636 patent in mid-1961. At that time, Angell was relatively recently out of engineering school with little or no experience in molding of plastics.

20) Angell's initial conception involved essentially what has been described as:

a. Heating a mixture of plastic and a blowing agent to a temperature above the foaming temperature;

b. Holding the mixture under pressure to prevent expansion; and

c. Rapidly injecting the mixture into a relatively cooler mold.

This conception, in light of prior art, was not new.

21) Angell's conception evolved into being used in a conventional two-stage injecting molding machine. This too was not new in view of prior art.

22) Angell's conception involved using a valve to "establish communication" between the accumulator and the mold. However, as first devised, his valve permitted the formation of an unfoamed slug of solid plastic which, on each subsequent molding operation or cycle, was injected into the mold along with the new charge of foaming molten plastic. This slug presumably had some effect on the structural integrity of the formed product and was thus thought unsatisfactory.

23) By the time of his application for what became the 636 patent, filed July 1, 1963, Angell had devised an improved valve which cured the problem of the unwanted slug. He did not disclose this valve in his application even though he conceived of the improved valve as being an integral part of the best mode for practicing his process.[2]

24) In his application, Angell does not disclose with any precision the kind of extruder to be used in his process and has illustrated the extruder with a blank box.

---

1. Here the Court feels it necessary to add that from this record, it is at pains to understand how heating to a molten state in the accumulation chamber as opposed to the extruder should make any difference such as to affect patentability. It is difficult to see how the grant of a monopoly could depend on something so trifling and obvious.

2. In so concluding, the Court has necessarily had to reconcile disparities in trial testimony with earlier depositional testimony and contemporaneous writings in Angell's notes. This conclusion is thus also based on pertinent exhibits and demeanor, etcetera, on the witness stand.

In fact, however, the best mode contemplated by Angell to practice his invention requires a particular kind of screw extruder having peculiar characteristics, i. e., having flights of a certain shape, length and number to mix and melt the plastic and blowing agent in a proper manner for the product in mind. In this, Angell failed again to disclose the best mode contemplated by him to carry out his process.

25) The Court is unable to find that plaintiff misrepresented to the Patent Examiner the Eyles patent disclosures and their relationship to the 636 patent application disclosures on the basis of the evidence now before the Court.

26) The Court finds that the subject matter of Claim 1 of the 636 patent was anticipated by the Eyles prior art patent, U. S. 3,162,703, in every particular.

27) Considering and weighing the scope and content of the prior art, especially the Dietz U. S. Patent 2,806,255; the activities and publications of Dow Chemical Company concerning its "Frostwood" process and the molding of Pelaspan F; the Foster-Grant activities and their Eyles U. S. Patent 3,162,703, and the discussions in the periodicals (Def. Ex. A, Tabs 7 through 12); and ascertaining the differences between the prior art and Claim 1 of the 636 patent, and finding them to be minimal or non-existent; and resolving the level of ordinary skill in the prior art and finding it exemplified by Hendry (Def. Ex. A, Tab 9), Foster-Grant's Eyles, and Dow Chemical's Zielinski; the Court finds that the subject matter of Claim 1 would have been and, in fact, was, plainly obvious to anyone skilled in the art.

28) The Court finds (see Findings 23 and 24, *supra* ) that plaintiff and its assignor failed to disclose anywhere the best mode contemplated by the inventor for carrying out the invention.

29) Notwithstanding the failure to disclose the best mode, the Court finds that plaintiff acted in good faith, albeit somewhat guarded; that it was not guilty of any fraud or other unconscionable or inequitable conduct; and that therefore, there are no facts making this an exceptional case, as that term is used in 35 U.S.C., § 285.

30) Notwithstanding any alleged invalidity of the 636 patent, the Court finds that defendants' injection molding machines differ from the machines used by plaintiff to carry out its invention in that defendants' machines are of the ram type extruder and employ a rotating torpedo, while those used by plaintiff are of the screw-extruder type. Moreover, plaintiff and its inventor knew and contemplated when they applied for the 636 patent that their process should be used only with a screw extruder as is more particularly described in Finding 24.

31) Plaintiff's charges of infringement are based on the claim that both defendants make and sell injection molding machines with instructions for using them to make foamed plastic products and that defendant SBMC uses injection molding machines to make foamed plastic products for sale to others.

32) Based on the differences between the machines, the Court finds that defendants have not infringed or induced any infringement of plaintiff's 636 patent.

33) The Court finds no deceptive intention in plaintiff's disclaimer of Claims 9 through 13 of the 636 patent. The Court finds that plaintiff had a good faith belief in so doing in the remaining claims of the 636 patent.

## II. Conclusions of Law

1) This Court has jurisdiction of the subject matter and the parties herein; and venue is proper in this Court. 28 U.S.C., §§ 1338 and 1400; 35 U.S.C., § 281.

2) Claim 1 of plaintiff's U. S Patent No. 3,268,636 is invalid and void for lack of novelty having been anticipated by the prior art, specifically the Eyles U. S. Patent No. 3,162,703. 35 U.S.C., § 102(e).

3) Claim 1 of plaintiff's U. S. Patent No. 3,268,636 is invalid and void on the grounds that the differences between the subject matter of Claim 1 and the prior art are such that the subject matter of Claim 1 would have been obvious at the time of the inven-

tion to anyone skilled in the art. 35 U.S.C., § 103.

4) Plaintiff's U. S. Patent No. 3,268,636 is invalid and void in its entirety for failure of the inventor to disclose in full, clear, concise and exact terms the best mode contemplated for carrying out the invention. 35 U.S.C., § 112.

5) Claim 1 of plaintiff's U. S. Patent No. 3,268,636 is limited to processes for molding foamed plastic articles in which a screw extruder is used to melt a mixture of a thermoplastic material and a blowing agent. Neither of the defendants herein has infringed Claim 1 either directly or by inducing others to do so. 35 U.S.C., § 282(1).

6) This is not an exceptional case which would give rise to an award of attorney fees, and the Court declines to exercise discretion to make such an award.

Therefore, it is

ORDERED that judgment be entered in favor of defendants that Claim 1 of U. S. Patent No. 3,268,636 has not been infringed; that Claim 1 of U. S. Patent No. 3,268,-636 is invalid for obviousness and lack of novelty; and that the U. S. Patent No. 3,268,636 is invalid and void in its entirety for failure to disclose the best mode to carry out the invention.